Good afternoon, I'm Jay Tuchton for Appellate Conservation Congress. May it please the Court, I'd like to begin my discussion at the opposite end of the preliminary injunction test from which I began my briefs and just talk for a few minutes about balancing and harm, issues that were never reached by the District Court. I'd like to do that to, one, point out what a tailored and limited injunction Conservation Congress is seeking here. But also in the last week, it became even more tailored and limited as a result of additional federal... Let me ask you this, Counsel, before you get to the latter part of the winter test here. Each party has filed some pleadings regarding mootness. We got yours recently, and your position is that neither of the exceptions here apply, that there is no mootness issue. You want us to decide this. If, arguendo, you were going to lose, would your position be different? Would you want us to find that this was moot? Well, I see what you're saying. I know it's a strange question, but I just want to find out whether you really mean what you're saying in terms of your mootness argument. Two points, Your Honor. First off, I don't believe it is moot. They have begun re-initiated consultation, but they haven't completed it. Right. And I think all the cases say when they complete it, there's a mootness issue. But I just... I'm inclined to agree with your argument. I'm just simply saying that if I were just saying, arguendo, that the Forest Service has made a valuable or made an appropriate case with respect to the non-formal aspects of this, and if we agreed with that, you would probably regret saying this was not moot, right? I may, Your Honor, but I would be being dishonest if I said it was moot right now. Okay. So you're sticking with that story no matter what? I think this is the right one. You have two points. One is a legal question about the cumulative nature and whether as a matter of law that should be decided. So let's just, for talking purposes, to play further on what Judge Smith is asking. Let's assume we were to determine that we have a hard time figuring out how you could require the cumulative effects in an informal, and that that right now isn't a moot question, but it's just a legal question. If we decided that not in your favor, just for talking purposes, where would that leave your appeal now or upon re-consultation and a new biological assessment or consultation determination? Well, one of the reasons I thought it's not presently moot is it's unlikely they will do this new consultation interpreting their regulations any different than they did before. So I still have this quarrel, which you're implying I might be on the short end of that stick. I'm just asking if you were on the short end of that stick, but I don't know. But I don't think that will go away. So that's why I think it needs to be reached. The other practical problem with mootness is they say they will redo this consultation sometime before May 15th when logging will commence again in critical habitat. I need to pursue an injunction as though they might not do that until May 14th, and I wouldn't have any ability to have the issue redressed depending on the timing. You said 124 acres has already been harvested. You don't know how much more, and you're concerned that if you don't have the right to get an injunction, the whole thing will be moot because it's all been logged. Yes, it's shrinking. There's approximately 3,000 acres to be logged in the wholesale. Originally, when we filed the appeal, 544 acres were critical habitat, and that's the part we were seeking to have in June. We failed last summer. 124 acres got logged. Importantly, that 124 acres is the part that they said was most important to them, the highest priority to manage fire risk and to treat forest diseases. So the benefits of the logging in critical habitat have largely been realized, at least the highest priority benefits. The new critical habitat rule shrinks the critical habitat in this area down to 248 acres. So we're only seeking an injunction of approximately one-twelfth of the total timber sale, 250 acres out of 3,000. They've agreed that they won't go in there until May 15th, and all I'm trying to accomplish is just get them to agree or get the court to confirm not to go in there until we can have our issue resolved on the merits as to the critical habitat. Now, none of that matters, obviously, if I can't prove some likelihood of success on the merits, which is where you were headed, Your Honor. To reverse a district court on a denial of a preliminary injunction, you have to prove that you used an erroneous legal standard or made a clear factual error. I tried both. On the erroneous legal standard, there's the three regulations that work together, 50 CFR, 402.12, and .13 and .14. .12 is the regulation that tells an action agency what to put in a biological assessment, and it says it's at the action agency's discretion, but may include cumulative impacts analysis. .13 is the Fish and Wildlife Service regulation of dealing with informal consultation, and it says there to look for likely adverse effects. It doesn't say anything about cumulative impacts, just likely adverse effects. Then you have the formal consultation regulation at .14, and it says informal consultation, they must look at cumulative impacts. The informal consultation regulation doesn't say anything at all, that they don't have to in formal consultation. What I think, though, is the way you would actually read or should read these regulations is to say it is discretionary, but it's possible for the agency to abuse its discretion by not doing it because it's discretionary. Here we have a situation where the Forest Service. Doesn't that defeat the whole purpose of an informal consultation, though? Not necessarily. It says look for likely adverse effects, and if you find none, you can stop, sort of the quickie consultation. Again, my understanding is that the purpose here is to, without getting all of the machinery of the various agencies involved, you can take an informal look, eyeball it, and see whether in fact you've got a problem. If you don't, you don't have to go to the next step. If you do all of the steps that the formal investigation requires, then why even have an informal method at all? What's the point of having that? Well, I mean, it certainly could be appropriate in some circumstances. Here on our facts, though, we have a situation where the Forest Service did say a cumulative impacts analysis would be useful in their biological opinion, and the Fish and Wildlife Service refused to look at it because they decided to go in a formal consultation. What I'm concerned about, and my client is concerned about, is you can carve up the world into timber sales of different sizes, and here we have a situation where there's been eight or nine timber sales in this area. There's three or four more coming. There's also private land logging, and if they do the quickie, the eyeball it, every time they say, this one's insignificant, no adverse effects, but they're never adding up the whole series. They say that's silly because you're adding up zeroes, but I'm arguing you're not really adding up zeroes. You're adding up a little bit. You're adding up a little bit, and that little bit will matter. We did the calculations in our brief to show that cumulatively, they've added the critical habitat in this area. I had to use the old designation because I didn't have the new designation, but they gave us enough figures to allow us to add up. Well, let me ask you, if we were to disagree on the first point, which is just a legal point, and as you say, .1 force has the mandatory language and the other stuff doesn't, then we would be left with figuring out if there are, in some cases, particularly here, there's an abuse of discretion or capricious action the way they did it. If that were determined, in this case not to be capricious action, do you think there's the possibility that down the road, if they keep doing these little segments, that at some point there would be a tipping point, even if it weren't hit here? At some point you'd hit the straw that breaks the camel's back and sort of defies credulity that they're not looking at it. So how would we benchmark the abuse or the capriciousness if we agree with your underlying premise on the second thing, that there could be a point at which it would be? How would we benchmark that to figure it out? Well, one thing that I think is instructive is that the action agency, the agency that's conducting all these projects, did put a cumulative impacts analysis in its biological assessment and said, we think this would be useful, that's the word they used. They sent that over to the expert agency, the Fish and Wildlife Service, and they said we're not going to look at it. To me, that makes this process somewhat paper shuffling. If they say this would be useful to do and the experts say we're not going to do it, I think that's instructive that it's reached the point where the agency taking the actions feels there is a need for this analysis, but the expert agency still is not doing that. It's funny because when you explain that, I would have thought the flip might be true, that if Forest Service didn't think cumulative was important, but the expert thought it might be, although it might not have been tipped here, that that would give you a better foundation because you'd have the expert agency saying that and not just the action agency. I think that would be true, and the expert agency also has the power to enter formal consultation, but here they haven't. They're continuing to piecemeal these sales. Do you agree that under Lands Council that what you've described doesn't really meet the definition of arbitrary and capricious? No. In other words, you're making new law if we agree with you. Well, I view this as distinct from Lands Council because I'm not challenging the agency's scientific expertise. I'm arguing that they read their regulations in a manner that categorically said they're not actually going to use their expertise and that the appropriate reading of the regulations is to say you can look at this here if there's a likely adverse effect. So I view it as more a legal issue than an attack on the agency's science. There was a part of it, if I may, Your Honor, I'm over my time, but the second argument I made where I said the district court made a factual error, some of the things we pointed out there do involve agency's scientific determinations, but I tried to steer clear of the Lands Council issue by accepting what the agency said. We're not challenging their science. We're challenging under the APA the conclusion that flows from that science, and so just very quickly they said, we pointed out that canopy cover would be reduced for 20 to 30 years. Below the standards the agency said the OWL prefers, and that that must be an adverse effect. But isn't that, with respect, counsel, isn't that really does get into the woods with the experts where you have a view, they have a view, and then all we do is to determine whether their view is so implausible there's no evidence to back that there's something to that effect under Lands Council. Isn't that correct? I think that is correct, but I think we are there when they're saying this is going to be reduced, they use the word degraded, below the OWL prefers. There are three technical terms I use, and degraded in this case is the least harmful of whatever. Yeah, that's very true, but the operative language is, is there a likely adverse effect? So you have to look at what they mean by degraded and decide if that's an adverse effect, and here they're saying essentially the roof of the forest is going to have holes in it for 20, 30 years. Yes there's walls and there's a floor, but that doesn't change the fact that you've got holes in your roof, and that that is an adverse effect. You rely on Sierra Club versus Marsh in your brief, is it still good law after winter? Well, the case I look at to determine for after winter is more Cotrell, Alliance for the Wild Rockies versus Cotrell, which doesn't answer that specific ESA question. Winter doesn't discuss TVA versus Hill. I view Marsh as progeny of TVA versus Hill, where the Supreme Court said... But remember, winter itself was an ESA case, and in that case the Supreme Court held that the government's interests outweighed that of the species. So isn't that pretty much diametrically opposed to what Sierra Club versus Marsh says, which is that you presume irreparable harm, that that is always ways, that interest is always ways in favor of the endangered species. Isn't that, aren't the two things, they can't live together? I think Congress still put its thumb on the scales by the language that was quoted in TVA. Perhaps, that's a new analysis, the question is whether Marsh is still good law. Whether it's automatically presumed? I don't think under winter that anything is automatic. Okay, fair enough. That seems to be what the court was saying, that they want to, I apologize for going over and thank you for the extra time. Thank you. Are you splitting time? We are, Your Honor. Okay. You must be Ms. Wang? I am, sir. Okay, go ahead. May it please the court, before I turn to the merits, I would like to briefly address the matter put forward in the government's January 2nd submission to the court, which is the matter of the, what we believe to be the impending mootness of the case. The Fish and Wildlife Service on December 4th issued a final rule designating a revised critical habitat for the northern spotted owl. And, with respect to the project, although the number of acres of designated critical habitat have actually decreased, out of an abundance of caution, the agencies have decided to take a new look. And, on December 28th, the Forest Service re-initiated a consultation, and upon completion of this process, the Fish and Wildlife Service will issue a new final determination that's based on new administrative record containing analysis that reflects the revised critical habitat designation. So, in our view, we believe that the current challenge could be dismissed as... But, this, from their perspective, though, this is, I think, when you get the new regulation, that would be the third bite at the apple, basically. They can't ever get you to deal with this. You did the informal investigation approach the first time, now you do it this time. If you come up with a new one, if you do the same thing again, then they're frustrated because they can't ever get the district court to enjoin what you're doing. In the meantime, the harvest continues. What's wrong with that analysis? Well, I think several issues, Your Honor. First, in terms of the reviewability of the action, the plaintiff always has the option of attempting to get a temporary restraining order in demonstrating harm, and, in fact, sought to... But, every time they do that, then you'll say, well, this is informal, and you don't have to have cumulative impact, and you don't have... We don't have enough... We've got degradation here. It's just a very small amount. There's no need for an injunction. Same thing you're saying in this appeal. It would depend on the facts of the case, Your Honor. I think that, in this case, because the amount of critical habitat that's being degraded is very minor compared to everything that is preserved. Let's get to the next point, which is that you've got these little chunks. He says, basically, you take a little nibble here and a little nibble there, and pretty not had to account before the court on the underlying issue. What's wrong with that? Well, I disagree with that argument, Your Honor, because, going forward, the Forest Service and Fish and Wildlife Service does take into account what's called the environmental baseline in performing this analysis. What that means is that it looks at sort of a snapshot in time of what the habitat and the species looks like at this moment. Going forward, the effects of this project, the Mudflow project, will be incorporated into the agency's analysis of proposed future projects in the McLeod Flats area, which means that if the small effects create a diminished baseline in the future for the next project, then that project's low-level effects may no longer be insignificant and may require formal consultation and preparation of a biological opinion. However, that was not the finding here, and the Forest Service and Fish and Wildlife Service finding here is well-supported by the record, demonstrating that the project's beneficial effects, including managing for these wildfire risks, which would destroy... But we're reviewing the district court, right? So, just in answering Judge Smith's question, you were looking at what the agency did, but it seems to me that your answer really should focus on what the district court did, and that is whether the district court was of use to its discretion in finding that the agency failed to take into account the cumulative effect of these various actions, right? And what had happened in this case, let's say the district court had looked at the situation and said, you know, I've looked at it, and I think that the agency did not fully take into account the cumulative effects. I'm going to issue a criminal injunction. Would you be here appealing that? If I understand Your Honor's question correctly, if the district court made a finding that we were legally required in an informal consultation context to undertake a cumulative effects analysis that's separate and apart from the environmental... Well, no. If it held that, then it would have been wrong as a matter of law, so then you'd have an easy appeal. But what you said is even if you don't have this cumulative effect, you look at this baseline, right? And the agency looks at the baseline, and the baseline includes the prior cumulative action. Let's say the district court looked at what the agency did and said, well, I think looking at the baseline, looking at the additional effects here, I think the agency was wrong. I think the agency... And I'm going to issue an injunction. How would that play out on appeal? Well, Your Honor, I think it would, of course, depend on the analysis and the portions of the record that the district court is pointing to, and, you know, it's... Well, I'm trying to figure out whenever would there be a case... I mean, you say, oh, well, at some point this would happen, and the agency would grant relief. But what if the agency doesn't grant relief? Whenever is there a case where the district court is able to issue a preliminary injunction? Well, Your Honor, if, for example, for the next project or five projects down the line, whenever the agency experts make that... Make a determination, for example, that, you know, the... Whether it's canopy cover or all of these other elements have declined to such a level that it's no longer discountable and no longer insignificant, and at that point, if the record supports that finding, the district court would be able to say that it's arbitrary and capricious for the agency to sort of disregard the record completely and find that it's not necessary to do a formal consultation. It really is a very fact-based analysis, and the facts here simply don't support that conclusion. I don't think that our position is that the district court could never find, for example, that the agency so completely... Well, I just wonder whether there's a practical matter. I mean, you're certainly not saying that as a formal matter, but as a practical matter. I have a hard time figuring out how the district court would ever find... I mean, sure, if the agency actually says all these things and then acts contrary to what it says, then, of course, the district court could act, but I'm just having a hard time figuring out in a real case, in a practical way, how the district court would ever enter an injunction. Should we hear from your court counsel? Yes, Your Honor. Thank you. May it please the Court. Julie Wise on behalf of the intervener, Sierra Pacific Industries. Sierra Pacific is the purchaser of the timber sale at issue in this case, the Mudflow timber sale. That's the timber sale that's being used to implement the Mudflow vegetation management project. And just to clarify one factual point, those acres have not been logged, Your Honors. The acres have been treated. Because it's important, Your Honors, Judge Smith talked about degradation, refers to a reduction in habitat components without a loss in habitat function. So it is not as though these acres have been clear-cut. Your Honors, the district court reached the right result in this case, and this, frankly, from our- By just treated, you mean thinning and other- Thinning, yes, in some circumstances. It might be sanitation to remove some of the really infected trees with the anosis and black stain, things of that nature, Your Honor. The district court- Does Sierra Pacific agree with the government's analysis of the mootness question? Your Honor, we think the court has discretion to declare this case anticipatorily moot. We agree that the case is not moot at this point, but that it will become moot after the completion of the reinitiated informal consultation. However, we also think you are wholly within your rights to simply affirm the denial of a preliminary injunction. And, frankly, that might be the more practical result in this case because Conservation Congress has not moved for summary judgment. Frankly, it would be rather inefficient for us to go back to the district court and face another TRO, another preliminary injunction, something of that nature, without having clarified- Sounds like everybody would like an answer. I think that's right, Your Honor. And from our perspective, the district court got the law right. And in some respects, the outcome in this case was preordained because it's important to realize what the Mudflow Project area really looks like. Your Honors, this is marginal northern spotted owl habitat at best. Originally, we had 554 acres of critical habitat under the 2008 designation. Now we're down to, Your Honors, 248 acres. And that's out of, now nationally, we have 9.6 million acres of critical habitat for the northern spotted owl. No northern spotted owls have nested in this area since 1992, for 20 years. And there's a reason for that. It's because this is not good habitat. The Mudflow Project is trying to improve on that habitat to make this better for northern spotted owls and for other creatures that use this type of habitat. Now the creature that uses this habitat that nobody seems to talk about is the human species. Because 99% of this area is within the McLeod-Wildland Urban Interface. And the district court recognized that, and that's important for us to recognize. That is an area where there is a high risk of fire to the human people who live around the area of the Mudflow Project. And the direction there for communities at risk is to reduce the fuel level. So, Your Honors, Sierra Pacific believes that the district court got the law right. The district court looked at the... The human species is not endangered. Last I looked, they were still growing. This is true, Your Honor. However, we would vote... Not that it's a good thing. I'm just saying it doesn't fall under the protections of the ESA. That's true, Your Honor. But fortunately for the northern spotted owl, none of the critical habitat in this area is being lost. Degradation in this case refers to positive things, Your Honor. The removal of some habitat components without removing habitat function. Actually, the record makes clear that here we can have some clearing of the understory. It is better for the owls. It is better access for the prey. And remember, Your Honors, no northern spotted owls have bred in this area for more than 20 years. So the canopy is not changing, or it is? The canopy is being reduced to some extent, yes. But in a positive way, Your Honor. The record actually makes clear that over the next 30 years the canopy will be closed back to the level it is now, which is a deleterious level. So, Your Honors, we really suggest that the court simply uphold the district court and affirm the denial of the preliminary injunction. This is kind of an adjunct, but does the barred owl use this area? The record in this case indicates that the barred owl has been nearby, but at the time of this project there were no barred owls detected in this area in addition to no northern spotted owls. So the implications for the spotted owl, which of course the barred owl is its mortal enemy, we just take that out of the picture. We're just looking at the forest. That's all the district court primarily did, I gather, right? That's correct, Your Honor. Okay, thank you. Thank you. Would you like a minute for rebuttal? One minute? Yes, Your Honor. Thank you. Very quick on the last point about the quality of the habitat. I mean, it may be only 248 acres, but the Fish and Wildlife Service, by designating it critical habitat, finds it essential to the conservation of the owl, meaning its survival and recovery. It's discongruous to say that something is essential to its survival and recovery and then say it's not very good. So I think that it's inappropriate to collaterally attack the habitat quality. But I wanted to follow up on a point you had made. I don't understand why. I mean, you could say it's critical, but it's not very good. It could be improved. That's true. What's the inconsistency in that? It could be improved. That's true, Your Honor. I concede that. And I think that's what they're saying. It remains essential to its conservation. Your Honor, I did want to follow up on one point you made, which is what we should be doing is reviewing the district court's findings, not the agency's findings. And there, there's another finding, in addition to the canopy cover that I wanted to mention, which is the district court overlooked that the record said most studies find that after this timber sale is conducted, the area would be below the basal level that the owl and its prey prefers. That's inconsistent with what counsel for Sierra Pacific just argued, which is this would be good for the owl. The record says most studies say it will be bad for the owl. Now, in the briefs, we got in a fight over that sentence, and I was faulted for not concluding it by saying 44% of foraging occurs in the areas that are similarly thinned. But we have to go back and say we're looking for an adverse effect, and reducing it down to 44% is an adverse effect. It may be real simple. If someone stole 56% of the things in my kitchen, my prey, I would feel adversely affected. And that's exactly what's going on with the owl here. They can't deny that there are any adverse effects occurring. Thank you. Okay, thank you.
judges: Kozinski, McKeown, Smith